UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

PATRIARCH PARTNERS XV, LLC and    :
OCTALUNA LLC,                          :

               Plaintiffs,          :

               v.                 :     No. 1:16-cv-07128-JSR

U.S. BANK NATIONAL ASSOCIATION and   :
MBIA INSURANCE CORPORATION,      :

               Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR**
<u>**APPLICATION BY ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**</u>

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone:  212.351.4000

*Attorneys for Plaintiffs*

Dated: October 2, 2016

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 4

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 4

    A.    Even as Modified by the Trustee in Response to the Temporary
          Restraining Order, the Proposed Sale Process Violates the "Commercially
          Reasonable" Standard of UCC Article 9 ................................................................ 4

    B.    The Trustee's Blind Adherence to Improper Terms Crafted by MBIA
          Amounts to a Breach of the Trustee's Fiduciary Duty to Plaintiffs ..................... 7

    C.    MBIA Knowingly Aided and Abetted the Trustee's Fiduciary Breach ............... 8

    D.    Both MBIA and the Trustee Have Breached the Indenture ................................... 9

          1.    The Indenture Precludes MBIA from Directing a Sale that Fails to
                Comply with UCC Article 9 ...................................................................... 9

          2.    The Trustee's Refusal to Honor Plaintiffs' Right to Books and
                Records Undermines Plaintiffs' Rights in the Sale Process ................... 10

    E.    Defendants' Adherence to this Improper Sale Process Violates the Implied
          Covenant of Good Faith and Fair Dealing ......................................................... 11

II.    PLAINTIFFS AND THEIR AFFILIATES WILL BE IRREPARABLY
      HARMED IF THE SALE IS CONSUMMATED ......................................................... 12

III.   THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR ............................... 13

    A.    Plaintiffs Merely Seek to Preserve the Status Quo and Ensure that Any
          Sale of the Collateral Is Conducted Fairly and Lawfully .................................. 13

    B.    MBIA's Smears Of Ms. Tilton Cannot Obscure Its Own Misconduct In
          This Case And In Concert With The SEC ......................................................... 15

CONCLUSION ................................................................................................................... 20

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Beck v. Mfrs. Hanover Trust Co.*,
    218 A.D.2d 1 (1st Dep't 1995) ...............................................................8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)..................................................................14

*Briarpatch Ltd., L.P. v. Geisler Robedeau, Inc.*,
    2007 WL 1040809 (S.D.N.Y. Apr. 4, 2007)......................................9, 10

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)....................................................................16

*Ingham ex rel. Cobalt Asset Mgmt. v. Thompson*,
    88 A.D. 3d 607 (1st Dep't 2011) ............................................................9

*Coxall v. Clover Commercial Corp.*,
    781 N.Y.S.2d 567 (N.Y. Civ. Ct. 2004)..................................................6

*Credit Agricole Corp. v. BDC Finance LLC*,
    135 A.D.3d 561 (1st Dep't 2016) .........................................................12

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)..................................................................11

*Elliott Assocs. V. J. Henry Schroder Bank & Tr. Co.*,
    838 F.2d 66 (2d Cir. 1988).................................................................3, 8

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
    2016 WL 4059155 (S.D.N.Y. 2016).......................................................8

*In re Frazier*,
    93 B.R. 366 (Bankr. M.D. Tenn. 1988) .................................................6

*Gidatex, S.r.L. v. Campaniello Imps., Ltd.*,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998)................................................14, 15

*Highland CDO Opportunity Master Fund v. Citibank N.A.*,
    2016 WL 1267781 (S.D.N.Y. March 30, 2016) .....................................7

*Jacobson & Co., Inc. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977)..................................................................15

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

## TABLE OF AUTHORITIES
(continued)

Page

*Lincoln First Bank, N.A. v. Salvaterra*,
   431 N.Y.S.2d 302 (Syr. City Ct. 1980)..................................................................10

*Marine Midland Bank v. CMR Indus., Inc.*,
   559 N.Y.S.2d 892 (1st Dep't. 1990).....................................................................7

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
   950 F. Supp. 2d 568 (2013) ...............................................................................17

*New York Progress and Protection PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013).................................................................................15

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
   2015 WL 5710645 (S.D.N.Y. Sept. 29, 2015)......................................................8

*Rabbani v. Enzo Biochem, Inc.*,
   682 F.2d 400 (S.D.N.Y. 2010)..............................................................................12

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)............................................................................13, 14

*In re Rourke*,
   288 B.R. 50 (Bankr. E.D.N.Y. 2003) ...................................................................14

*Sumner v. Extebank*,
   452 N.Y.S.2d 873 (1st Dep't 1982) ......................................................................6

*Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*,
   No. 15-CV-7940, 2016 WL 1381821 (S.D.N.Y. Apr. 5, 2016) ............................14

**Statutes**

U.C.C. § 9-610(b) ...................................................................................................7, 10

U.C.C. § 9-612 .............................................................................................................5

U.C.C. § 9-627(b)(3)....................................................................................................10

**Regulations**

17 C.F.R. § 203.2 ........................................................................................................21

17 C.F.R. § 240.24c-1 .................................................................................................21

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

## <u>PRELIMINARY STATEMENT</u>

It is now crystal clear and, indeed, tacitly admitted in Defendants' opposition that the proposed auction sale they attempted to effectuate was not commercially reasonable.  So how else do they respond?  From the first paragraph of its opposition, Defendant MBIA smears Lynn Tilton, the owner of Plaintiffs Patriarch XV and Octaluna, by, among other things, rehashing baseless SEC charges that have no bearing on the narrow issue to be decided in this case.  In fact, it turns out, MBIA colluded with SEC lawyers to advance its own litigation objectives. *See* below at III.B.  But such smear tactics cannot obscure either MBIA's misconduct here or the Trustee U.S. Banks's fiduciary breaches at MBIA's behest.

As expedited discovery has now further exposed, MBIA's repeated, urgent directives to the Trustee, to rig the September 15 auction of Zohar I Collateral in its favor, caused the antithesis of a "commercially reasonable" process—in violation of the UCC, the Trustee's own fiduciary duties, and the Indenture.  That is the focus of this proceeding, and the record before this Court amply supports continuing the emergency injunction against this Proposed Sale, even as inadequately "modifi[ed]" by the Defendants, and imposing Court-supervised oversight to ensure a commercially reasonable process that protects all creditors and maximizes the sale's return.

Defendants have conceded that the Proposed Sale was commercially unreasonable by unilaterally renouncing two of its improper components.  Specifically, the Trustee has now abandoned the plan to offer the Collateral on an "all or nothing basis", and has abandoned the restriction of permissible bidders to a small group of "qualified institutional buyers" ("QIBs").  Indeed, in the Trustee's 2016 letter (the "Modification Letter"), Ex. 22,[1] withdrawing

---

[1]  All citations in the form "Ex_" refer to the Exhibits to the Affirmation of Mark A. Kirsch dated September 12, 2016 (Exhibits 1-21) or the Declaration of Robert F. Serio dated October 2, 2016 (Exhibits 22-51).

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

those terms, Defendants tacitly acknowledged that, in contrast to their own planned sham process, any "commercially reasonable" sale must, as Plaintiffs have urged,  (1) entertain bids for individual items of Collateral, as well as bids for the entire portfolio of Collateral, and (2) recognize as a qualified bidder any accredited investor permitted to purchase in a private placement exempt from the registration requirements of the Securities Act of 1933.

Even with those two modifications, the Proposed Sale is still commercially unreasonable.  To be commercially reasonable, any sale process must satisfy the following additional criteria:

- **Timing**.  Defendants' Modification Letter proposes a 21-day period from the vacating of the TRO to auction.  This remains far too short a time in which to permit appropriate diligence given the diverse, illiquid, and complex nature of the 132 identified individual items of Collateral.  The sale process must afford prospective bidders at least a 60-day diligence period in advance of the bidding deadline.

- **Scope**.  The scope of the sale must be limited to the 132 identified items of Zohar I Collateral that are held by the Trustee for the benefit of all Noteholders pursuant to the terms of the Indenture.  The Trustee cannot sell unidentified and ill-defined items of "Other Collateral" or "Other Assets," "known or unknown," as it purported to do in the August 26, 2016 Notice of Public Sale and Invitation to Bid.

- **Access**.  The sale can commence only after Plaintiffs have the opportunity to inspect the Trustee's books and records, and consult with the Trustee's officers and employees, as is Plaintiffs' right under the Indenture, and whose repeated requests were documented in letters to the Trustee, dated August 22 and 30, 2016 and September 23, 2016. And any bidders in such a sale process must be bound by strict confidentiality protections.

Defendants' opposition repeatedly misstates the facts and the law.  For example:

- Defendants seek to hide behind Duff & Phelps ("Duff") as liquidation agent, claiming that Duff "developed a recommendation for the Proposed Auctions' procedure, including timing."  But expedited discovery has belied that narrative, revealing, instead, that Duff—whose retention was pushed by MBIA, ███████████████████████ did no more than implement the commercially unreasonable terms that MBIA dictated and the Trustee adopted, in violation of the UCC.  Of note, Duff's affiant himself never claims to have recommended that the Collateral sale go forward on the original less than three weeks' notice, stating, instead, that Duff merely "considered" the timing and got "comfortable" with it after the fact. In other words, Defendants simply mischaracterized in their own papers, the

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

statements to which their own witnesses swore.  Even worse, expedited discovery
revealed, in fact, that Duff was █████████████████████████████████████████
███████████████████████████████████████████  *See* Exs. 23, 24.

- Defendants try to blame their commercially unreasonable Proposed Sale on Plaintiffs,
  claiming that the short time period Defendants allotted for the Sale process passes muster
  because the Trustee only has "limited information" from Patriarch about the Collateral—
  a dispute being resolved in a pending "books and records" litigation in Delaware that was
  tried in August 2016 and is awaiting imminent decision.  In fact, all pertinent records are
  in the possession of the Trustee and the successor collateral manager.  *See* Ex. 25.
  Indeed, thousands of pages of documents ████████████████████████████████████
  ███████████████████████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████  Moreover, it
  should have waited until the impending post-trial decision was handed down in the
  Delaware expedited case, instead of rushing to consummate a sale, at MBIA's behest,
  that was designed to steer the Collateral to MBIA so that MBIA could avoid imminent
  insolvency.  In any event, expedited discovery revealed that ███████████████████
  ███████████████████████████████████████████████████████████████████████████
  ███████████████████████████████████████  *See* Ex. 26.

- Defendants misrepresent the legal standards applicable to fiduciaries.  In the face of well-
  settled New York authority that an indenture trustee's post-default duties resemble those
  of an ordinary fiduciary—regardless of any exculpatory provisions in the Indenture,
  including those at issue here—the Trustee contends that it was legally entitled to blindly
  follow the improper sale terms dictated by MBIA to advantage MBIA at the expense of
  other creditors.  In so doing, the Trustee purports to rely on inapposite cases involving a
  trustee's pre-default duties, not the post-default duties at issue here.  U.S. Bank, as
  Trustee, unquestionably has fiduciary duties in the context of this post-default asset
  sale.  MBIA claims its asset grab is nevertheless immunized by Section 13.2 of the
  Indenture, even though the Indenture expressly requires compliance with "applicable
  law" in the exercise of remedies.  Ex. 2, § 5.4.  MBIA's directives here clearly were not
  in compliance with "applicable law."

In sum, Defendants' misconduct and fiduciary breaches, which threaten Plaintiffs and

their affiliates with catastrophic and irreparable harm, cannot be countenanced.  If MBIA's plan

succeeds, MBIA will own all of the Collateral and "Other Collateral," "known and unknown,"

obtained at a fire-sale price, at the expense of all other parties.  And Plaintiffs' rights will be

extinguished forever.  This Court should therefore preliminarily enjoin the Proposed Sale, enjoin

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

MBIA from directing any future sale process that fails to adhere to the requirements of UCC

Article 9 and the Defendants' contractual and fiduciary obligations to Plaintiffs, and only permit

a future sale under court-supervised oversight to ensure commercial reasonableness.

## ARGUMENT

### I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A.      Even as Modified by the Trustee in Response to the Temporary Restraining Order, the Proposed Sale Process Violates the "Commercially Reasonable" Standard of UCC Article 9

Plaintiffs have demonstrated they are likely to succeed on the merits of their claim that

the Trustee violated the "commercially reasonable" standard of Article 9 of the UCC.  Indeed,

the Trustee effectively conceded in the Modification Letter that at least two egregious

components of its Proposed Sale process—the offer of the Collateral on an "all or nothing basis,"

and the restriction of permissible bidders to a small group of "qualified institutional buyers"

("QIB")—were commercially unreasonable.  *See* Ex. 22.

Defendants nonetheless persist in arguing the original sale timing—on less than three

weeks' notice, to market a diverse pool of 132 distinct financial assets, relating to 53 different

entities, operating in 24 industries—was commercially reasonable, *see* Tr. Mem. at 10, and they

expect plaudits for offering now to conduct the sale on 21 days' notice, as if four more days

makes a difference.  *See* Ex. 22.  Retaining Duff, which purportedly "developed a

recommendation for the Proposed Auctions' procedure, including timing" does not cure the

infirmity of the auction timing, as Duff served only as a rubber stamp for MBIA's imposed,

commercially unreasonable terms.  Tr. Mem. at 5.  Defendants' opposition papers and

documents establish that, among other things, MBIA: (1) instructed the Trustee to hire Duff, Tr.

Mem. at 5; (2) ████████████████████, *see,* Ex. 27; *see also* Finkel Decl. at ¶ 6; (3)

dictated the "all or none" bidding term, *see* Finkel Decl. at 63; (4) ████████████████████

4

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

███████████████████████████████████████████, Ex. 28; and (5) ████████

████████████████████████████████████████████████████

████████████████ Finkel Decl. at 14; *see* Ex. 29 ███████████████████

████████████████ Ex. 30 ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

Putting aside Duff's "yes-man" status, the timing of the Proposed Sale is not commercially reasonable.  Defendants maintain that, under UCC § 9-612, "[t]he delivery of notice 17 days prior to the auction date is presumptively reasonable, because it exceeds by 7 days the UCC's 10-day safe-harbor for notices of public dispositions."  Tr. Mem. at 10.  In fact, that safe-harbor provision only governs the notice that a secured party must afford the *debtor* when it decides to exercise rights against any collateral.  *See, e.g.*, *Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567, 572 (N.Y. Civ. Ct. 2004).  Notice to debtors is an entirely separate matter from the required market notice for a commercially reasonable sale.  *See Sumner v. Extebank*, 452 N.Y.S.2d 873, 874 (1st Dep't 1982) ("[The UCC] grants the secured creditor the right to dispose of collateral in cases of default, so long as notice is sent to the debtor, *and* the sale is commercially reasonable as to the *time*, place, manner and terms") (emphasis added).

Thus, apart from whether notice to the debtor is sufficient, a sale must not be conducted in "unreasonable haste."  *See In re Frazier*, 93 B.R. 366, 369-70 (Bankr. M.D. Tenn. 1988) (aircraft sale more than a month after default was commercially unreasonable in light of "highly specialized and limited market," and experts had opined commercially reasonable sale required ninety days to one year).  Here, issuing the Sale Notification on less than three weeks' notice, on

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

the cusp of Labor Day weekend, for the sale of "privately issued securities from small companies with little or no publicly available information," is the height of commercial unreasonableness. *See* Reohr Aff. ¶ 13.  Nor would the 21-day period Defendants now propose be any better.

Remarkably, Defendants argue that little time is needed to evaluate the assets because there is little information about them, and that that is somehow Plaintiffs' fault. Tr. Mem. at 10. As an initial matter, this is patently untrue: all pertinent records have been turned over.  *See* Ex. 25.  Thousands of pages of documents ███████████████████████  But even if true, it would be commercially unreasonable for Defendants to sell Collateral that Duff calls "unique" and with "very few analogies" when so much information is lacking.  Finkel Decl. at ¶50.

Finally, even the limited, expedited document discovery obtained to date confirms that Duff's process from its inception to ensure MBIA would secure the winning bid.  The Trustee claims Duff created a list of potential bidders who were contacted only to confirm contact information (and not told Collateral was involved); sent an Invitation to Bid right before Labor Day weekend; followed-up a small sample only to confirm receipt; and published notice only twice in the Wall Street Journal and once in a "Creditflux" daily blast.  Finkel Decl. ¶¶ 27-40. Defendants wrongly liken their conduct to that of the defendants in *Highland CDO Opportunity Master Fund v. Citibank N.A.*, 2016 WL 1267781 (S.D.N.Y. March 30, 2016), who similarly assembled a distribution list and advertised in the Wall Street Journal.  But there a CDO fund was at issue that invested in rated notes issued by other funds, which are much easier to evaluate than the unrated corporate loans and equity interests that comprise the Collateral, a fact illustrated by the 82 bids by seven entities for 23 assets for sale, plus one "all or nothing" bid there.  *Id.* at *2, * 20.  In contrast, Defendants claimed seven parties entered the data room, ██

██████████████████████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

███████████████████████████████████████████████████████████

████    Besides MBIA's credit bid, Defendants generated essentially no interest in the Collateral in the 14 business days they allowed for notice on an all-or-nothing sale basis for the valuable and diverse nine-figure Collateral.

The Proposed Sale is particularly suspect here because the Trustee unconditionally accepted MBIA's commercially unreasonable directions, despite obvious red flags concerning MBIA's scheme.  MBIA's right to direct the sale does not abrogate the Trustee's duty to dispose of the Collateral in a commercially reasonable manner.  *See Marine Midland Bank v. CMR Indus., Inc.*, 559 N.Y.S.2d 892, 900 (1st Dep't. 1990) ("UCC requirement that any post-default disposition of collateral be commercially reasonable . . . may not be waived").  The Indenture confirms expressly this.  Ex. 2 § 5.4(a) (Controlling Party's direction cannot "conflict with any rule of law," including UCC § 9-610(b).)

### B.   The Trustee's Blind Adherence to Improper Terms Crafted by MBIA Amounts to a Breach of the Trustee's Fiduciary Duty to Plaintiffs

The Trustee claims its "duties are defined by the Indenture," Tr. Mem. at 16, but fails to address the well-settled New York authority that an indenture trustee's *post-default* duties "more closely . . . resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture," and include a "fiduciary duty of *undivided loyalty* to trust beneficiaries."  *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 11 (1st Dep't 1995) (emphasis added); *accord, e.g.*, *FMS Bonds, Inc. v. Bank of N.Y. Mellon*, 2016 WL 4059155, at \*14-15 (S.D.N.Y. 2016) .[2]

---

[2]  *Elliott Associates v. J. Henry Schroder Bank & Trust Co*., 838 F.2d 66, 67,71 (2d Cir. 1988), *cited in* Tr. Mem. at 16, involving pre-default duties, is inapposite, as is *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2015 WL 5710645, **3**-6, \*6 (S.D.N.Y. Sept. 29, 2015), *cited in* Tr. Mem. at 16.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

Further, the Trustee's adoption of a commercially unreasonable auction plan, in violation of the UCC, separately constitutes a breach of fiduciary duty because the Trustee improperly favored MBIA's interests over those of the other "trust beneficiaries," i.e., Plaintiffs, to which it owes an "undivided duty of loyalty." *Beck*, 218 A.D.2d at 12.

Finally, the Trustee attempts to dodge liability under *Beck* by claiming that unlike the *Beck* trustee, it did not fail to "rely on any 'independent valuation'" in setting the "upset price" (i.e., reserve price) for a collateral auction. Tr. Mem. at 17. But the Trustee's own evidence confirms Duff was selected by MBIA for this job; that MBIA was involved in setting the terms of the engagement; and that Duff simply rubber-stamped *all* of MBIA's proposed auction parameters. *See* Section I.A. *supra.* The Trustee's alleged reliance on Duff, MBIA's proxy in this process, therefore cannot shield the Trustee from liability.

Thus, Plaintiffs are likely to prevail on the merits of their fiduciary-duty claim.

## C.      MBIA Knowingly Aided and Abetted the Trustee's Fiduciary Breach

Plaintiffs have shown they are likely to succeed on their claim that MBIA aided and abetted the Trustee's breach of its fiduciary duties to Plaintiffs when it instructed the Trustee to rig a sale of the Collateral in a commercially unreasonable manner. MBIA attempts to justify its behavior on the basis that it "was doing nothing more than exercising its contractual rights," claiming that its motives in so doing are irrelevant. MBIA Mem. at 19-20. MBIA's purported justification is contrary to New York law.

First, in *Ingham ex rel. Cobalt Asset Mgmt. v. Thompson,* 88 A.D. 3d 607, 608 (1st Dep't 2011), *cited in* MBIA Mem. at 19, an aiding and abetting claim was dismissed on statute of limitations grounds, and because there was no reason the defendant "should have suspected it was assisting wrongdoing". *Id.* Here, MBIA was the actual architect of the wrongdoing. Among other things, as early as April 19, 2016, MBIA instructed the Trustee to include "Other

8

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

Collateral" in the description of the Collateral to be sold, in an apparent attempt to permit MBIA

to claim later that the sale included unspecified Portfolio Company equity too. Ex. 23.

Essentially MBIA intends to steal both the Collateral and anything else it can get its hands on.

Second, MBIA's transparent motive to steal the Collateral to avoid impending

receivership is plainly relevant to Plaintiffs' aiding and abetting claim.  MBIA completely

ignores Plaintiffs' cited cases concluding that self-serving economic motives inform an aiding

and abetting breach of fiduciary duty analysis.  Instead, MBIA misleadingly cites to *Briarpatch*

*Ltd., L.P. v. Geisler Robedeau, Inc*., 2007 WL 1040809, at *22 (S.D.N.Y. Apr. 4, 2007) to

support its claim that "MBIA's financial condition and purported motives for its directions to the

Trustee are insufficient to support [Plaintiffs'] claim for aiding and abetting a breach of fiduciary

duty," MBIA Mem. at 20, even though the court did not "reject[]" the argument that a "financial

motive to aid in misconduct" can "evidence defendants' knowledge of breach of fiduciary duty."

*See id.*

### D.     Both MBIA and the Trustee Have Breached the Indenture

#### 1.     The Indenture Precludes MBIA from Directing a Sale that Fails to Comply with UCC Article 9

MBIA concedes that Section 5.13 prohibits MBIA from directing the sale of the

Collateral when that direction would "conflict with" any rule of law.  MBIA Opp. 12.  MBIA's

only response is that its direction did not "conflict with" UCC §§ 9-610(b) and 9-627(b)(3)

because the Proposed Sale is commercially reasonable.  *See id.* at 12.  As set out in Section I.A.

*supra,* both the timing and the nature of the Proposed Sale are commercially unreasonable.[3]

---

[3]  MBIA's reliance on *Lincoln First Bank, N.A. v. Salvaterra*, 431 N.Y.S.2d 302, 303 (Syr. City Ct. 1980) is misplaced, as the Court acknowledged "the requirement that every aspect of the disposition [] be commercially reasonable."

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

    2.    **The Trustee's Refusal to Honor Plaintiffs' Right to Books and Records Undermines Plaintiffs' Rights in the Sale Process**

The Trustee does not dispute it has denied Plaintiffs access to the Trustee's books and records pursuant to the Indenture, Section 6.1(f).  It argues Plaintiffs are merely entitled to see the data room documents, apparently bound by whatever judgments the Trustee made in selecting documents for inclusion.  The Indenture does not bind Plaintiffs to acceptance of those judgments, nor can Plaintiffs be treated like the potential bidders that are strangers to the Indenture.  Defendants also claim falsely that Plaintiffs never requested data room access prior to this litigation.  Plaintiffs repeatedly sought access, but the Trustee forbade it without a "bidder confidentiality undertaking", designed to restrict the rights of non-party bidders to use information gleaned from the data room solely for the purpose of evaluating whether to bid.  Defendants cannot straightjacket Plaintiffs, parties to the Indenture, that way.

The Trustee also complains that Plaintiffs did not respond to its August 12, 2016 letter purportedly "offer[ing] to discuss a records inspection with Octaluna."  Tr. Opp. at 19.  But the August 12 letter relates to an entirely different matter - Preference Share Paying Agent Agreements (irrelevant to this case) – and at a time when the Proposed Sale had not even been announced.  *See* Ex. 26.

Finally, Plaintiffs have standing to pursue their injunction claim because their Section 6.1(f) inspection rights are related to the Proposed Auction.  To establish standing, Plaintiffs must show that their injury will be "likely redressable by a favorable decision."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (internal citations omitted).  Here, an injunction compelling the Trustee to hold a commercially reasonable sale process and to permit Plaintiffs their contractual rights to access the relevant books and records in advance of any sale, Ex. 1 ¶ 114, would necessarily redress the harms that the Trustee's conduct will cause Plaintiffs.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

### E.    Defendants' Adherence to this Improper Sale Process Violates the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs' brief cites seven cases supporting their claim that MBIA breached the implied covenant of good faith and fair dealing by wholly defeating the very purpose for which the Indenture was created, namely to grant to the Trustee the Collateral in trust "for the benefit and security" of the parties to the Indenture, including *all* the Noteholders.  *See* Pl. Mem. at 17-18; *see also* Ex. 2, Granting Clauses.  Defendants responded to none.

Defendants instead claim wrongly that Plaintiffs' good faith and fair dealing claim is duplicative of their breach of contract claim.  *See* MBIA Mem. at 18-19.[4]  But the good faith and fair dealing claim is broader than the breach of contract claim.  MBIA separately acted in bad faith by aiding and abetting the Trustee's breach of fiduciary duties, Ex. 1 ¶¶ 77-83, and by seeking to sell so-called "Other Collateral" that is not theirs to sell, Ex. 1 ¶ 52.  *See Credit Agricole Corp. v. BDC Finance LLC*, 135 A.D.3d 561, 561 (1st Dep't 2016) ("[E]ven if none of the provisions of the agreements were violated, defendants breached the implied covenant of good faith and fair dealing by deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets, thereby acquiring all of the debtor's assets and depriving plaintiffs of the benefit of their bargain").[5]

---

[4]    MBIA cites *Rabbani v. Enzo Biochem, Inc.*, 682 F.2d 400, 413 (S.D.N.Y. 2010) for this proposition, but in *Rabbani*, the district court did not dismiss the plaintiff's implied-covenant claim because it was duplicative, but because the defendant had, in fact, acted in good faith. 682 F.2d at 413-14.

[5]    Defendants' argument that Plaintiffs' good faith and fair dealing claim conflicts with the express terms of the Indenture's "safe harbor" provision requiring MBIA to notify *the Noteholders* as debtors fails for the reasons set forth in Section I.A. *infra* (explaining how Defendants misinterpret the UCC's safe harbor provision); *see also* Trustee Br. at 20; MBIA Br. at 19.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

## II.   PLAINTIFFS AND THEIR AFFILIATES WILL BE IRREPARABLY HARMED IF THE SALE IS CONSUMMATED

For numerous reasons, permitting Defendants' revised auction of the Collateral to proceed will still result in irreparable harm to Plaintiffs, notwithstanding Defendants' concessions regarding the auction procedure.

Defendants admit Zohar I and its siblings are unique investment vehicles, the collateral of which are not readily marketable or rated securities. Ex. 1, ¶2 (page 9), ¶22.  Valuation is therefore extremely difficult.  Reohr Aff., ¶¶12-13.  Consequently, if Defendants' proposed auction proceeds on Defendants' terms, and Defendants are later found liable, damages will be particularly difficult to ascertain.  Courts have recognized this constitutes irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).  And because the Indenture purports to render the sale of the Collateral final and irrevocable, Ex. 2, § 5.4(c), after a sale Defendants will claim Plaintiffs' rights under the Notes are extinguished—the definition of irreparable harm.  Moreover, and as discussed *supra*, the Trustee continues to violate Plaintiffs' right to inspect Zohar's books and records, which courts likewise have found is irreparable harm.

Plaintiffs also will suffer irreparable harm by losing the opportunity to monetize their equity in portfolio companies that are obligors to the Zohar I, II, and III funds.  Pl. Mem. at 22. Defendants do not dispute that the cloud of uncertainty over ownership of this equity will dampen the market for sale of any such companies if the auction is permitted to proceed. Moreover, Defendants' continued attempt to auction undefined "Other Collateral" also will cause Plaintiffs irreparable harm, as it would be extremely difficult to value damages after their sale. *See Register.com*, 356 F.3d at 404.

Contrary to Defendants' assertion, Octaluna's "last look" rights in no way rectifies this wrong.  MBIA Mem. at 21.  (Patriarch XV has no such rights.)  Although Plaintiffs have a

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

contractual right to match the winning bid and secure the Collateral, doing so would require an outlay of cash by Plaintiffs exceeding $149 million, unlike MBIA's credit bid that requires no cash outlay.

Even if monetary damages could compensate Plaintiffs (and it cannot), the Trustee's own authority recognizes that injunctions have been entered where a defendant's assets might be dissipated or otherwise shielded from recovery before final relief can be ordered. *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, No. 15-CV-7940, 2016 WL 1381821, at *2 (S.D.N.Y. Apr. 5, 2016). In this regard, MBIA neither denies that it will soon be insolvent, nor that, in the event of insolvency, money damages against it may be unrecoverable. *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.").[6]

## III. THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR

### A. Plaintiffs Merely Seek to Preserve the Status Quo and Ensure that Any Sale of the Collateral Is Conducted Fairly and Lawfully

Where the failure to grant an injunction would cause much greater harm than the imposition of the requested injunction, the balance of the equities favors imposition of an injunction. *See New York Progress and Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013). The balance tilts even farther in favor of the movant where there is no demonstrable harm, as here. *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977).

---

[6] Finally, the two-week "delay" between the Trustee's notification to Plaintiffs of the intended auction of the Collateral and Plaintiffs' filing of suit does not preclude a finding of irreparable harm or imposition of a preliminary injunction. Tr. Mem. at 21, n.13. The Trustee's case, *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419-20 (S.D.N.Y. 1998), is readily distinguishable, as the plaintiff there delayed eight months—not just two weeks—before requesting injunctive relief, and the conduct to be enjoined had been ongoing for decades. In fact, *Gidatex* recognized that ten weeks amounts to only a "brief" delay, and that a "credible explanation for [a movant's] inactivity" may excuse delays in filing for injunctive relief. *Id.* at 419.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

The Trustee has not even attempted to argue that it will be harmed by a preliminary injunction.  MBIA's attempts to allege various harms fail. MBIA Mem. at 23-25. Specifically, MBIA alleges that delay in disposing of the Collateral will result in uncertainty and impact the marketability of the Collateral.  *Id.* at 25.   To be sure, though, there will be no less market uncertainty if Defendants' proposed auction is permitted to proceed in the midst of a lawsuit challenging its very legality than if the auction is delayed pending this Court's careful and final consideration of Plaintiffs' claims.  MBIA further alleges that its contractual rights will be infringed because the injunction will afford Plaintiffs "veto" powers over the manner in which the Collateral is auctioned.  *Id.* at 24.  To the contrary, Plaintiffs simply request that any collateral sale be conducted on commercially reasonable terms, including strict confidentiality over information provided to potential bidders.[7]

Defendants' own authority establishes that the balance of hardships weighs decidedly in favor of the movant if "the costs outweigh the benefits of not granting the injunction."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  That is certainly the case here, when comparing the grave risks of disposing of unique,

---

[7] Plaintiffs have finally been permitted data room access. ██████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ That agreement broadly indemnifies the Trustee and the Liquidation Agent for, among other things, claims and damages arising from "any breach of the undersigned's representations and warranties," including an agreement to use the information in the data room "solely for the purposes of evaluating whether . . . to participate in the [Sale Process] and for no other purpose whatsoever." Kirsch Aff., Ex. 4 (Exhibit B to Notice of Public Sale and Invitation to Bid) (emphasis added).  Yet the very parties most likely to be injured by an unauthorized disclosure—the portfolio companies [and Ms. Tilton]—lack any such protections.  Therefore, Plaintiffs respectfully request that Your Honor exercise supervision over any future, commercially reasonable sale process, including by modifying the Confidentiality Agreement to indemnify not only the Trustee and the Liquidation Agent, but also the Portfolio Companies [and Ms. Tilton]. *See* Ex. 51.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

difficult-to-value securities in a rigged auction with the lack of harm if a preliminary injunction is imposed merely to maintain the status quo.

### B.   MBIA's Smears Of Ms. Tilton Cannot Obscure Its Own Misconduct In This Case And In Concert With The SEC

MBIA has tried to smear Ms. Tilton in an effort to divert the Court's attention from its own misconduct in connection with the Proposed Sale.  This is the same tactic MBIA used successfully to get the SEC to bring a baseless case against her and help advance MBIA's own litigation objectives.[8]  The SEC's allegations are not germane to the merits of this narrow dispute concerning improprieties in the auction process for the Collateral.  But MBIA's effort to inject them into this case requires a response.  And as Your Honor weighs the equities, it is the evidence of MBIA's improper collusion with the SEC staff to advance its own commercial agenda that bears real scrutiny.  Documents that the SEC has been required to produce from its own files in its case against Ms. Tilton, including internal handwritten notes and emails, reveal that the ongoing SEC proceedings against Ms. Tilton are the product of shocking back-room dealings between MBIA and the SEC.

The SEC-produced evidence shows:  a concerted campaign by MBIA to: (1) map out a trumped up case against Patriarch for the SEC staff, using confidential information obtained directly from Ms. Tilton in supposed good faith "negotiations" to restructure the Zohar funds and protect investors; (2) gain secret access from the SEC to indisputably confidential materials produced by Patriarch to the SEC staff, ████████████████████████████████ ████████████ (3) secure permission from the SEC staff, once they committed to going forward together, to instead use (and keep) the information gleaned from those confidential materials to

---

[8] This unholy alliance between the Division and MBIA will be fully exposed at the trial of the SEC's case against Ms. Tilton.  The SEC's theory in that case is simply wrong—and, indeed, two of the SEC's five Commissioners voted against authorizing charges.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

"commence litigation" against Patriarch; and (4) further secure the SEC staff's agreement not to reveal to Patriarch that they had disclosed Patriarch's confidential documents to MBIA without giving prior notice to MBIA of the SEC's intention to do so— ██████████████████ ████████████████████ Ex. 32 (SECNOTES000495).[9]

MBIA began its discussions with the SEC in 2011, after it had already sued Patriarch in this District for alleged breaches of contract relating to Patriarch's obligation to obtain ratings for certain unfunded junior Zohar I Notes. MBIA wanted $180 million from Ms. Tilton in that lawsuit. In 2012, the case went to trial before Judge Sweet, who rendered a complete defense verdict. As Judge Sweet found, Ms. Tilton had done nothing wrong and MBIA's claims were false. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (2013). Once MBIA failed to take Ms. Tilton down in front of Judge Sweet, it cranked up its campaign against her at the SEC.

As the SEC's internal documents reveal, MBIA was ██████████████████ ██████████████████████████ *See* Ex. 32 (SECNOTES000495) ██████████████ ██████████████████ For their part, the SEC lawyers investigating Ms. Tilton were interested in MBIA's cooperation and obtaining information from MBIA about the Zohar funds, ██████████████████

At about the same time, MBIA drew Ms. Tilton into a series of discussions with MBIA's chief restructuring officer, Anthony McKiernan, other MBIA personnel, and representatives

---

[9]   The SEC has produced certain notes of witness interviews and marked them as "confidential." Although there is no protective order in the SEC proceeding, nor do the Respondents in that proceeding have any similar agreement with the Division, Plaintiffs have filed these notes under seal in an abundance of caution and will seek a ruling from this Court that they may be publicly filed.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

from Barclays, an additional noteholder, about a potential restructuring of Zohar I.  The discussions, which began in late 2012, centered on whether there was going to be an extension of the maturity date for Zohar I, so that Ms. Tilton could continue to unlock and monetize the value underlying the notes.  In early 2013, the discussions culminated in a term sheet circulated among the parties.  *See* Ex. 33 (Mar. 15, 2013 Tilton email to McKiernan).

As these events were unfolding, MBIA communicated on a parallel track with the SEC's Division of Enforcement (the "Division"), ███████████████████████████████ ███████████████████ Ex. 34 at SECNOTES000721. ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████ Ex. 35 at SECNOTES000664 (MBIA/SEC meeting notes). ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ Ex. 36 at SECNOTES000728.[10]

By late August 2013, MBIA conveyed to the SEC lawyers that ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Ex. 34 at SECNOTES000725.  The SEC lawyers surely understood that a restructuring of Zohar I would greatly diminish the chances of their being authorized to bring a case against Ms. Tilton and

---

[10]   *See, e.g.*, Ex. 35 at SECNOTES000668 ████████████████████████████ ███████████████████████████████████████████ Ex. 34 at SECNOTES000721 █████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

Patriarch.  That is because any investor that agreed to a restructuring would have had to implicitly approve of Ms. Tilton's continued and past stewardship of the Zohar funds, thereby gutting the SEC's potential case.

As troubling as it is to see the SEC staff so enmeshed with a commercial party, it is equally troubling that the communications between MBIA and the SEC's Division staff flowed both ways.  Just as MBIA fed confidential information to the SEC that MBIA deceptively gleaned from Ms. Tilton under the guise of good-faith settlement negotiations, the SEC staff reciprocated, supplying MBIA with a wealth of clearly confidential information—information that Ms. Tilton had provided to the SEC under the rubric of the SEC's investigation.  In December 2013 and January 2014, the SEC Division lawyers gave MBIA a trove of confidential financial documents—including financial statements, interest payment and accrual listings, balance sheets, and income statements—for eight of the Zohar I portfolio companies.  *See* Exs. 37-38 (Dec. 18, 2013 and Jan. 30, 2014 e-mails).  As they were doing this, these SEC lawyers knew that

Ex. 34 (SECNOTES000722); *see also id.*

Indeed, the terms "proposed by the SEC" for MBIA's receipt of these confidential documents—while ostensibly claiming that the documents should "be treated confidentially by MBIA and its counsel"—expressly authorized MBIA to "freely commence litigation against Ms. Tilton, Patriarch," or their affiliates, "based on

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

information MBIA learns in the documents," so long as it does not "cite or attach any of the documents received from the SEC to any complaint while those documents remain confidential and non-public."  Ex. 37 (Dec. 17, 2013 e-mail).  And the SEC staff even agreed not to reveal to Ms. "Tilton" "that the documents and information have been provided to MBIA and its counsel" without "first apprising MBIA and counsel of that fact."  *Id.*  In other words, the SEC authorized MBIA to use this confidential information, but to keep the SEC's fingerprints off of it.

Documents in hand, MBIA chose not to allow a restructuring to go forward.  Instead, it set its sights on litigating against Ms. Tilton and trying to obtain ownership of all of the Collateral, fully understanding the litigation advantage it was gaining through the SEC's actions.

The SEC lawyers and MBIA knew full well that the information exchange to which they agreed was not only extremely out of the ordinary, but also contrary to applicable regulations and policy.  *See, e.g.*, 17 C.F.R. §§ 203.2, 240.24c-1.  After all, the SEC Division lawyers had ██████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████  Ex. 45 (SECNOTES000715).

The upshot of all of this was that the SEC caused MBIA to forego a restructuring that would have helped all noteholders because it would have sunk the SEC's investigation against Ms. Tilton.  Instead, as the SEC staff lawyers plainly contemplated when they gave MBIA these confidential documents, MBIA decided to forego a workout and, instead, pursue a strategy of litigation.  Ex. 37 (Dec. 17, 2013 e-mail).  The SEC's case was intertwined with that strategy.  And this latest MBIA gambit of a rigged collateral sale is the near culmination of it.

What makes this alliance so unholy is that the SEC Division staff was involving itself far beyond investigating and, instead, was picking the winner in a commercial dispute that should

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER
CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

have been left to be resolved among sophisticated private parties.[11]  Indeed, the SEC Division sought to conclude its case before MBIA had to pay out claims on Zohar I, let alone face exposure to claims on Zohar II that now threaten to render MBIA insolvent in the coming months.  *See, e.g.*, Ex. 50 (Mar. 30, 2015 Wall St. J.).

Given MBIA's unclean hands and misconduct in (i) manipulating this auction process to try to steer these assets to MBIA alone in a "fire sale", and (ii) colluding with the SEC to target Ms. Tilton through the sharing of confidential information for MBIA's litigation use, MBIA cannot be heard to claim a balance of equities weighing in its favor.  Equity demands that MBIA's targeted assault on Plaintiffs' and Ms. Tilton's rights—whether through improper, back-room dealings with the SEC or improper efforts to manipulate the sale process for the Collateral—cannot be countenanced.

## CONCLUSION

The Court should enter a preliminary injunction against these Defendants and enter such further relief as is necessary to ensure a commercially reasonable sale of these assets.[12]

---

[11] MBIA's counsel has stayed in close contact with SEC Division staff since filing its charges against Ms. Tilton and Patriarch.  In fact, as reflected in internal e-mails produced by the SEC late last month, MBIA and SEC Division staff communicated more than two dozen times between April 23, 2015 and September 19, 2016.  *See, e.g.*, Ex. 46 at Tilton-SEC-A-000000000002 (Apr. 23, 2015 e-mail from Anne Tompkins of Cadwalader to Amy Sumner); Ex. 47 at Tilton-SEC-A-000000003047 (Sept. 19, 2016 e-mail from Jonathan Hoff of Cadwalader to A. Sumner).  On June 1, 2015, MBIA's outside counsel even offered to "update" the SEC on their "work[] on the issues in the Indenture regarding the May 20th sale date."  Ex. 48 at Tilton-SEC-A-000000000256 (e-mail from A. Tompkins to A. Sumner).  Just days earlier, that "work" resulted in an agreement, at MBIA's request, to amend the Indenture to avoid the required, immediate sale of the Collateral on the understanding that MBIA and Patriarch would continue to work toward a restructuring.  Instead, no agreement was reached before the maturity date, and Zohar I went into default.  The automatic result of the default was that Patriarch XV and Octaluna's rights were subordinated to MBIA's right to repayment first.  *See* Ex. 49 § 2 (Fifth Supplemental Indenture).  Were it not for the May 2015 amendment, this case would not exist: Patriarch would have sold the Collateral, as was its right, and all noteholders would have been repaid *pari passu* from any sale of the Collateral.  MBIA therefore would have shared Ms. Tilton's interest in maximizing value, instead of leveraging its now "first-in-line" position to try to steal the entire Collateral.

[12] Plaintiffs will review the documents of which Defendant MBIA requests the Court take judicial notice, and will raise any objection before or at the preliminary injunction hearing.  S*ee* MBIA's Request for Judicial Notice dated September 27, 2016.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION**

Dated: New York, New York
       October 2, 2016

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:      /s Randy M. Mastro
        Randy M. Mastro
        Mark A. Kirsch
        Robert F. Serio

200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000

*Attorneys for Plaintiffs*